Beth E. Terrell, WSBA #26759
Blythe H. Chandler, WSBA #43387
Attorneys for Plaintiff and the Class
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450
Email: bterrell@terrellmarshall.com
Email: bchandler@terrellmarshall.com

David C. Silver, *pro hac vice forthcoming*
Jason S. Miller, *pro hac vice forthcoming*
Attorneys for Plaintiff and the Class
SILVER MILLER
11780 West Sample Road
Coral Springs, Florida 33065
Telephone: (954) 516-6000
Email: DSilver@SilverMillerLaw.com
Email: JMiller@SilverMillerLaw.com

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STORMSMEDIA, LLC, a Louisiana limited liability company; and on behalf of all others similarly situated;<br><br>      Plaintiff,<br><br>    v.<br><br>GIGA WATT, INC., a Washington corporation; and GIGA WATT, PTE, LTD., a foreign corporation;<br><br>      Defendants. | NO.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff STORMSMEDIA, LLC, a Louisiana limited liability company ("Plaintiff"), individually and on behalf of all other persons and entities similarly situated as defined herein, by and through undersigned counsel, hereby sues GIGA WATT, INC., a Washington corporation; and GIGA WATT, PTE, LTD., a foreign corporation (collectively "GIGA WATT" or "Defendants"), for damages and for equitable relief. In support thereof, Plaintiff alleges as follows:

## **PRELIMINARY STATEMENT**

1.    This nationwide class action is brought by Plaintiff STORMSMEDIA, LLC, individually and on behalf of a class of similarly situated investors (the "Class Members") who contributed more than $20 million worth of cryptocurrency (bitcoin or Ether) or fiat currency (*e.g.*, U.S. Dollars, Euros) during an Initial Coin Offering (ICO) in or about June 2017 - August 2017 propagated by Defendants -- a contribution that, due to the rising value of the cryptocurrency invested by the Plaintiff Class, is now valued at more than $100 million.

2.    Defendants spent months promoting interest in their purported development of a full-service, turnkey processing center to house high-capacity cryptocurrency mining equipment in the state of Washington that would provide miners a "full range of mining services from hosting, maintenance, and repair to private blockchain servicing" (the "Giga Watt Project"). The state of Washington

1  was chosen as the site of the Giga Watt Project because, *inter alia*, it has one of

2  the lowest electricity costs to consumers in the world.

3       3.    Defendants also promoted to investors that, hand-in-hand with

4  hosting and maintaining mining equipment, Defendants would also provide

5  interested investors -- for a separate investment of cryptocurrency -- "purchase

6  and delivery of mining equipment [and related power supplies] through [GIGA

7  WATT, PTE LTD.] with its subsequent setup and hosting at Giga Watt's facilities

8  in Wenatchee, WA."

9       4.    At the time Plaintiff and each Class Member made his/her/its

10  investment, the Giga Watt Project was not fully developed or functional.

11       5.    For each investment of bitcoin, Ether, or fiat currency in GIGA

12  WATT prior to the launch of the Giga Watt Project, the investor would be given

13  either: (a) Ethereum-based cryptocurrency tokens called Giga Watt tokens

14  ("WTT") which were newly-created by Defendants and which represented the

15  exclusive right to use the Giga Watt Project's capacity rent-free for 50 years, or

16  (b) mining equipment and related power supplies to be set up and deployed by the

17  GIGA WATT team at the site of the Giga Watt Project.

18       6.    The investor would not be given his/her/its Giga Watt tokens or

19  machinery, however, until Defendants released a specific batch of the tokens or

20  machinery, based on how far along the Giga Watt Project was in its development

1    and functionality.  Giga Watt tokens were not scheduled to be released by

2    Defendants to the investors any earlier than July 15, 2017, though the more likely

3    initial release date was August 7, 2017 -- about a week after the ICO had

4    concluded. As such, each investor in the ICO was given nothing more for

5    his/her/its investment than the future right to receive, on some anticipated date, a

6    number of Giga Watt tokens or machinery commensurate with the investor's

7    investment that would then allow the investor access to the yet-to-be-developed

8    Giga Watt Project.

9        7.      At the time of the ICO, the WTT were valued at approximately $1.00

10   - $1.20 per WTT, though Defendants purported that value would skyrocket once

11   the Giga Watt Project was fully developed and functional.

12       8.      To induce interest and investments in the Giga Watt Project, and to

13   maintain interest amongst concerned investors after development of the Giga

14   Watt Project had languished beyond acceptable timeframes, several GIGA

15   WATT representatives have overtly and unmistakably stated to investors that

16   between the time of the ICO and the date on which each investor would be issued

17   his/her/its Giga Watt tokens, the value/price of each Giga Watt token was

18   anticipated to increase significantly.  Moreover, GIGA WATT represented that

19   the appreciation in value of the Giga Watt tokens would not be the only income-

20

1    producing avenue open to GIGA WATT investors as a by-product of their

2    investments, *to wit*:

> (a)    GIGA WATT Chief Executive Officer recently
>        published and disseminated to GIGA WATT
>        investors a newsletter in which GIGA WATT
>        touted several "of the new income opportunities
>        Giga Watt will bring to its WTT holders in 2018";
>        and
>
> (b)    GIGA WATT's in-house General Counsel Zeev
>        Kirsh, on GIGA WATT's behalf, represented in
>        writing to Plaintiff earlier this week that by the
>        time GIGA WATT completes its entire build-out,
>        the "anticipated value/price of the tokens will
>        likely climb quite a bit."

9.    Giga Watt tokens allegedly derive their value from the usefulness, availability, functionality, and popularity of the Giga Watt Project -- development and launch of which was and is entirely in Defendants' control.

10.    Moreover, Defendants held within their sole control the ability to determine when the Giga Watt Project was far enough along in its development for Giga Watt tokens and machinery to be issued to investors. Investors were, and still are, at Defendants' mercy with regard to when, if ever, the investors would be issued their Giga Watt tokens and machinery.

11.    As of the date of this filing, the Giga Watt Project is purportedly still being developed and, upon information and belief, might never be fully launched.

CLASS ACTION COMPLAINT - 5

12.    Many investors have not been issued their Giga Watt tokens or had their machines set up and deployed, fear that they might never be issued their tokens or see their mining machines activated, and are losing valuable time and money as Defendants indefinitely delay the further development of the Giga Watt Project.

13.    Additionally, Defendants have represented to Plaintiff that virtually all of the cryptocurrency raised from investors in the ICO has been converted to cash, released from escrow, and was put into a GIGA WATT operating account -- which Plaintiff and other Class Members reasonably believe means that the funds raised have been dissipated, or will be dissipated, before the investors receive their Giga Watt tokens/mining equipment or any opportunity to receive a return on their investments.

14.    The GIGA WATT investors invested in a common enterprise and with an expectation that their investments would increase in value and produce for them a substantial return -- all pivotal occurrences that would be derived solely from the efforts of others, namely Defendants.

15.    In short, the thing for which Plaintiff and each Class Member invested his/her/its valuable assets looks like a security, functions like a security, and fits the definition of a security. Securities regulators look beyond the form or

1  label someone appends to his/her/its activity and instead consider the actual

2  substance and purpose of the activity.

3        16.    Notwithstanding Defendants' attempts to avoid governmental and

4  private scrutiny, it is clear that Plaintiff and the Class were indeed profit-seeking

5  investors in a security and that Defendants promoted and conducted an

6  unregistered offering of securities.

7        17.    Defendants appear to have already pocketed for themselves large

8  sums of money for their promotional efforts, and -- due to the many

9  misrepresentations, factual omissions, and unlawful activities engaged in by

10 Defendants -- it appears Plaintiff and the Class cannot, and potentially will not,

11 see any return on their investments.

12       18.    In describing ICOs as a "fertile ground for fraud on investors,"

13 United States Securities and Exchange Commission (SEC) Chairman Jay Clayton

14 recently said: "[I]nvestors often do not appreciate that ICO insiders and

15 management have access to immediate liquidity, as do larger investors, who may

16 purchase tokens at favorable prices. Trading of tokens on these platforms is

17 susceptible to price manipulation and other fraudulent trading practices."[1] Mr.

18
_____

19 [1] Jay Clayton, *Governance and Transparency at the Commission and in Our*

20 *Markets*, Remarks at the PLI 49th Annual Institute on Securities Regulation -

1    Clayton went on to state: "The SEC may not yet have policy or rulemaking

2    answers in these areas, but we are on the lookout for ways to fight the type of

3    opacity that can create an environment conducive to misconduct."

4        19.    Proof of Defendants' deceptive activity and intentional deprivation

5    of investors' rights and protections under the federal securities laws is not

6    required or determinative as to Plaintiff's claims. That is because Defendants are

7    strictly liable for offering and selling unregistered securities. Nevertheless,

8    Defendants' deceptive advertisements, blogs, and investor updates are outlined

9    below to stress the urgency and need for immediate judicial intervention to

10    preserve Plaintiff's and other investors' significant financial interests which

11    Defendants currently control, and to rectify existing and future irreparable harm

12    to Plaintiff and other investors.

13        20.    Plaintiff and Class Members seek compensatory and equitable relief

14    rescinding their investments in GIGA WATT and restoring to them the assets and

15    funds they were induced into investing.

16

17

18

_____

19    New York, NY (November 8, 2017), https://www.sec.gov/news/speech/speech-

20    clayton-2017-11-08.

## GENERAL ALLEGATIONS

## THE PARTIES

**Plaintiff**

21.    Plaintiff STORMSMEDIA, LLC is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana. Between July 17, 2017 and August 2, 2017, Plaintiff transmitted to Defendants 332.61230901 bitcoin and 319.994542 Ether as its investment in GIGA WATT, broken down thusly: (a) 127.437975 bitcoin and 319.994542 ether invested for the disbursement of WTT tokens, and (b) 205.17433401 bitcoin for 154 Antminer D3 machines, related power supplies, and deployment/setup fees. Plaintiff's bitcoin and Ether (now being held, in one form or another, by Defendants) are currently worth approximately $5,100,000.00.

22.    On or about November 22, 2017, Plaintiff presented to Defendants a written demand that Plaintiff's investments in GIGA WATT be rescinded -- a demand that Plaintiff repeated on numerous occasions thereafter, including a December 11, 2017 demand written on Plaintiff's behalf by undersigned counsel. Pleading for the remedy Defendants themselves set forth in the terms of their investment materials, Plaintiff made it clear that the only acceptable remedy for Defendants' wrongful actions was rescission of Plaintiff's investment.

23.     As of the date of this filing, Defendants have failed to provide a meaningful response to Plaintiff's demand and instead seem intent on merely stalling for time despite having violated the terms of their own White Paper and having refused to adhere to their own terms for an investor remedy.

**Defendants**

24.     Defendant GIGA WATT, INC. is a Washington corporation with its principal place of business in Wenatchee, Washington. Upon information and belief, GIGA WATT, INC. is currently controlled by its founder, Dave Carlson.

25.     Defendant GIGA WATT PTE, LTD. is a foreign for-profit corporation which lists its principal place of business in Singapore. GIGA WATT PTE, LTD. sold to investors mining equipment and related power supplies that could be installed and hosted at the Giga Watt Project's business site(s) in Washington. Upon information and belief, GIGA WATT PTE, LTD. is currently controlled by Dave Carlson.

26.     Upon information and belief, GIGA WATT, INC. and GIGA WATT PTE, LTD. are alter egos of one another and are operated by Dave Carlson, who continues to operate the businesses through the present day while ignoring all corporate formalities and using the two companies interchangeably as mere instrumentalities for his personal interests in an attempt to shield himself from personal liability for his wrongful conduct.

CLASS ACTION COMPLAINT - 10

**Other Liable Persons/Entities**

27.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff, but respecting whom Plaintiff currently lacks specific facts to permit it to name such person or persons as a party defendant. By not naming such persons or entities at this time, Plaintiff is not waiving its right to amend this pleading to add such parties, should the facts warrant adding such parties.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds Five Million Dollars ($5,000,000.00), exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than Defendants. *See*, 28 U.S.C. § 1332(a) and 1332(d)(2)(A). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### Personal Jurisdiction

29.     This Court has personal jurisdiction over Defendants because: (a) at least one Defendant is operating, present, and/or doing business within this

1    District, and (b) Defendants' breaches and unlawful activity occurred within this

2    District.

3        30.    Defendants solicited investors in this jurisdiction, including Plaintiff,

4    to participate in the Giga Watt Project -- reaping from those investors large sums

5    of money and other assets, including valuable cryptocurrency.

6        31.    In light of the foregoing, Defendants purposefully availed

7    themselves of the benefits of operating in this jurisdiction; and this Court may

8    exercise personal jurisdiction over Defendants.

9                                        **Venue**

10       32.    Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial

11   part of the events or omissions giving rise to the claims set forth herein occurred

12   in this judicial district, as GIGA WATT, INC. resides in Washington and the

13   Giga Watt Project has its mining facilities located in Washington.

14       33.    In light of the foregoing, this District is a proper venue in which to

15   adjudicate this dispute.

16           **FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS**

17                       **Cryptocurrency Coin Mining**

18       34.    Unlike fiat currency such as U.S. dollars or Euros -- which are

19   printed by governmental entities -- cryptocurrency comes into existence in the

20

CLASS ACTION COMPLAINT - 12

1    decentralized, self-regulated world of cryptocurrency through the dogged work of

2    individuals or entities known as miners.

3         35.    Bitcoin mining is the process by which transactions are verified and

4    added to the public ledger, known as the blockchain, and also is the means

5    through which new bitcoin are released.

6         36.    While anyone with access to the internet and suitable hardware can

7    participate in mining, the work is difficult and the hardware -- along with the

8    electricity required to operate that hardware -- is oftentimes expensive.

9         37.    The mining process involves compiling recent transactions into

10   blocks and trying to solve a computationally difficult algorithmic puzzle. This

11   work typically requires several computers working together to be running 24-

12   hours-a-day.

13        38.    The miner who first solves the puzzle gets to place the next block on

14   the blockchain and claim the rewards for his/her/its efforts.

15        39.    The rewards, which incentivize mining, are both the transactional

16   fees associated with the transactions compiled in the block as well as the newly-

17   released bitcoin, of which there is only a finite number that can ever exist in the

18   world.

19

20

1    40.    Mining cryptocurrency today holds much of the same allure that

2    drew gold prospectors to California in the late-1840s. If the mining is successful,

3    great wealth can be amassed in a short amount of time.

4    **The Giga Watt White Paper**

5    41.    In or about May 2017, GIGA WATT published its White Paper,

6    setting forth the terms of its scheduled ICO and what participants should expect

7    for investing in the Giga Watt Project.

8    42.    According to the GIGA WATT White Paper, the following is the

9    substance of the Giga Watt Project:

10    The Giga Watt Project is built in partnership between
      Giga Watt, Inc. a U.S. company ("Giga Watt" or
11    "Company"), which offers mining hosting services at its
      Wenatchee, WA facilities, and GigaWatt Pte. Ltd., a
12    Singapore company ("Partner"), which sells mining
      equipment to customers worldwide.
13    *          *          *

14    Giga Watt's standard turnkey solution includes purchase
      and delivery of mining equipment through its Partner
15    with its subsequent setup and hosting at Giga Watt's
      facilities in Wenatchee, WA, with hosting fees starting as
16    low as 7.5 USD cents/kW/hour, zero setup fees (for
      equipment purchased through its Partner) and uniquely
17    low minimum facility entrance threshold of 1 miner of
      any model.

18    43.    Under the section labeled "Payment Terms," the White Paper

19    provides the following, in pertinent part:

20

1

2

3

> All funds collected through the pre-sale and [the ICO] will be deposited in escrow. Original payments made in BTC and ETH will be converted to USD at the rate effective at the time when the rights to WTT tokens were reserved.

4

5

> The funds will be released from escrow in step with the completion of facilities.

6

44.    According to a statement subsequently published by Andrey

7

Kuzenny (GIGA WATT's Chief Coordinator) on one of GIGA WATT's online

8

support channels, all of the funds converted to USD were originally placed into

9

an escrow account maintained by the Seattle, Washington-based international law

10

firm Perkins Coie.

11

45.    As for what the mining facilities ("pods") would look like, the

12

projected timeline of the development of the Giga Watt Project, and when each

13

investor should expect to receive his/her/its Giga Watt tokens and mining

14

equipment, the White Paper provided the following projected images:

15

16



17

18

19

20



*Size: 12'x48'*
*Independent fiber-optic Internet connection*

High-pressure fans constantly circulate fresh air through the pod. Filtered air intakes are positioned on one side, with exhaust fans on the other. Rain and snow "fallout area" provides cool shade at intake. Shade placement of transformers ensures higher efficiency and better longevity.

and further set forth the following timeline:

**Projected Construction Timeline**
3 units, 2.25 MW are available right now

[Batch 1]
- July 15, 2017: 1 Giga Pod completed, 0.75 MW

[Batch 2]
- August 1, 2017: 2 Giga Pods completed, 2.4MW

- August 15, 2017: Expansion of the unit, 0.9 MW

[Batch 3]
- September 1, 2017: 3 Giga Pods completed, 4.5 MW

[Batch 4]
- September 15, 2017: 9 Giga Pods completed, 15 MW

[Batch 5]
- October 1, 2017: 3 Giga Pods completed, 4.5 MW

[Batch 6]
- November 15, 2017: 3 Giga Pods completed, 4.2 MW

Plaintiff, for example, found itself in Batch 4, based upon when it made its investments.

46.    With regard to the risks involved in the ICO, GIGA WATT's White Paper states:

> Construction timeline specified in this White Paper is based on the reasonable estimates but is not guaranteed. This timeline may change, and the construction may be delayed because of many factors, including those beyond Giga Watt's control, such as the actions of third parties (contractors, suppliers, etc.). **If the completion of the capacities is delayed by more than 3 months from the projected date, and, consequently, the relevant WTT tokens are not issued, the escrow agent may issue a refund at the request of the WTT token purchasers. The refund will be issued in the original form of payment at the exchange rate on the date of the refund.**

(emphasis added).

47.    Finally, lest it be unclear that the GIGA WATT management team and its business partners were seeking to obtain as much compensation for their promotional efforts as they could manufacture, the White Paper reveals that the GIGA WATT insiders would distribute to themselves additional tokens for every 100 WTT sold during either the ICO pre-sale or the ICO itself:

> For every 100 tokens **sold**, 15 additional tokens will be issued and retained for the team, partners and advisors: 10 tokens to be distributed to team members, and 5 to be

CLASS ACTION COMPLAINT - 17

1

2

retained for distribution to partners and advisors at [GIGA WATT's] discretion.[2]

48.     The subtle inclusion of the self-determined bonuses for GIGA

3

WATT insiders is common in the emerging, and largely unchecked, self-serving

4

world of ICO fundraising.

5

49.     As noted above, SEC Chairman Jay Clayton warns that fundraising

6

efforts in exchange for tokens issued for start-up or open-source projects are ripe

7

for misconduct -- especially because "insiders and management have access to

8

immediate liquidity, as do larger investors."

9

50.     The one-sided terms imposed upon Plaintiff and the Class Members

10

in the GIGA WATT ICO White Paper are both unconscionable and illusory. The

11

GIGA WATT White Paper purports to require agreement from the investors that,

12

despite the investors' investments, GIGA WATT might not allocate to the

13

investors any WTT or mining equipment at all; and even after a three-month

14

delay has occurred, GIGA WATT still might not rescind or refund any investor's

15

cryptocurrency investment -- all while retaining the investors' invested funds and

16

17

[2] Emphasis added, reflecting that the event triggering the GIGA WATT

18

management team's entitlement to, and receipt of, additional tokens was the **sale**

19

of tokens, not the post-ICO issuance of those tokens or the post-ICO distribution

20

of Giga Watt tokens to the investors.

CLASS ACTION COMPLAINT - 18

1    assets and while having released to themselves (*i.e.*, the GIGA WATT insiders)

2    additional WTT tokens merely for having procured the sale of undelivered

3    investor tokens and machinery.

4        51.    Moreover, GIGA WATT retained in its sole discretion the ability to

5    determine when, if ever, an investor token release would occur or an investor's

6    mining equipment would be set up and deployed -- decisions to which investors

7    were rendered helpless and over which they had no influence.

8        52.    The onerous manner in which GIGA WATT imposed upon investors

9    its terms render the terms unfair, unconscionable, oppressive, and a contract of

10    adhesion.

11                **Pre-Network Launch Tokens Are Securities**

12        53.    Additionally, by their very nature, tokens sold before a network

13    launch are securities, because investors purchasing those tokens are relying on the

14    technical and managerial efforts of others to affect the failure or success of the

15    enterprise.

16        54.    While pre-network launch tokens may someday have a consumptive

17    use, the fact that they have no pre-launch utility renders them almost entirely

18    dependent upon the efforts of the issuer to successfully develop and launch a

19    functional network.

20

1   55.   Here, Plaintiff and the Class were (and still are) entirely dependent

2   upon Defendants to launch the Giga Watt Project and provide some valuable use

3   to the Giga Watt tokens for which Plaintiff and the Class have already provided

4   their investment funds.

5   **No Safe Harbor**

6   56.   The statutory safe-harbor provided for forward-looking statements

7   under certain circumstances does not apply to any of the allegedly false

8   statements pleaded in this Complaint.

9   57.   Many of the specific statements pleaded herein were not identified as

10  "forward-looking statements" when made.

11  58.   To the extent there were any forward-looking statements, there were

12  no meaningful cautionary statements identifying important factors that could

13  cause actual results to differ materially from those in the purportedly forward-

14  looking statements.

15  59.   Alternatively, to the extent the statutory safe-harbor does apply to

16  any forward-looking statements pleaded herein, Defendants are liable for those

17  false forward-looking statements because at the time each of those forward-

18  looking statements were made, the particular speaker knew that the particular

19  forward-looking statement was false or that the forward-looking statement was

20

CLASS ACTION COMPLAINT - 20

1    authorized or approved by an executive officer of the defendant entities, who

2    knew those statements were false when made.

### FACTS SPECIFIC TO INVESTOR PLAINTIFF

### Stormsmedia, LLC

5    60.    Between July 17, 2017 and July 28, 2017, Plaintiff transmitted to

6    Defendants 127.437975 bitcoin and 319.994542 Ether as its investment in

7    362,122 Giga Watt tokens to be issued by Defendants on or about September 15,

8    2017. A large percentage of Plaintiff's purchase was transacted between July 25,

9    2017 and July 28, 2017.

10    61.    In addition, between August 1, 2017 and August 2, 2017, Plaintiff

11    transmitted to Defendants 205.17433401 bitcoin as its investment in 154

12    Antminer D3 machines, related power supplies, and deployment so those

13    machines could be installed and hosted at the Giga Watt Project's business

14    location(s) in Washington.

15    62.    The total sum of Plaintiff's 332.61230901 bitcoin and 319.994542

16    Ether (now being held, in one form or another, by Defendants) is currently worth

17    approximately $5,100,000.00.

18    63.    To make its investments, Plaintiff placed its purchases through the

19    Cryptonomous platform -- a Singapore-based online platform through which all

20    payments for WTT tokens were collected and through which all WTT tokens

1   were to be issued and distributed by Defendants to GIGA WATT investors --

2   from Plaintiff's business location in New Orleans, Louisiana and followed the

3   instructions provided.

4          64.    Upon information and belief, Cryptonomous and Defendants share a

5   common ownership interest.  GIGA WATT PTE, LTD. and Cryptonomous each

6   have their official registered place of business at the same exact office suite in

7   Singapore. Additionally, Andrey Kuzenny -- who is GIGA WATT's Chief

8   Coordinator -- is also a Co-Founder of Cryptonomous and, upon information and

9   belief, continues to act as a principal of each of the corporate entities today.

10         65.    Although Plaintiff was supposed to receive its Batch 4 WTT by

11  September 15, 2017 and was supposed to have its 154 Antminer D3s up-and-

12  running at the Giga Watt Project by October 1, 2017, no such issuance took place

13  by those dates.

14         66.    On or about December 14, 2017, Defendants published on their

15  Medium page an "Announcement Regarding Batch 4 Tokens,"[3] which stated, in

16  pertinent part:

17

18

19  [3]https://medium.com/@gigawatt/announcement-regarding-batch-4-tokens-

20  f669748f08b8.

CLASS ACTION COMPLAINT - 22

Giga Watt
Best Home For Your Mining
Dec 14 · 4 min read

Dear WTT buyers,

Despite our best efforts, the delivery of the final portion of the Batch 4 WTT will fall outside the time frame of our original targeted maximum delivery date according to the whitepaper.

Batch 4 tokens that were purchased before 10pm UTC on July 24th, 2017, will be issued on 25th December, 2017.

Any WTT that were purchased after 10pm UTC on July 24th, 2017, are expected to be delayed. It is estimated that the power for these tokens will be ready by the end of February, at which time we should be able to issue your WTT. If your tokens were bought after 10pm UTC on July 24th, 2017, you are entitled to a refund of your WTT tokens in the original form of payment, and will receive the USD amount that was paid when the tokens were bought.

(emphasis added).

67.     Plaintiff has presented to Defendants numerous written demands that Plaintiff's investments in GIGA WATT be rescinded -- including several demands after a 90-day delay without Plaintiff's paid-for WTT being issued to Plaintiff or Plaintiff's paid-for mining equipment and related power supplies being timely set up and deployed at the Giga Watt Project.

68.     Despite Plaintiff's repeated demand for a refund of its cryptocurrency, Defendants have failed and refused to rescind Plaintiff's investments and refund to Plaintiff the cryptocurrency Plaintiff delivered to Defendants -- a refund that, according to Defendants' own terms, Plaintiff is entitled to and which should "be issued in the original form of payment at the exchange rate on the date of the refund."

CLASS ACTION COMPLAINT - 23

1

## CLASS ACTION ALLEGATIONS

2      69.    A class action is the proper form to bring Plaintiff's and the Class

3  Members' claims under Fed. R. Civ. P. 23. The potential class is so large that

4  joinder of all members would be impractical. Additionally, there are questions of

5  law or fact common to the class, the claims or defenses of the representative

6  parties are typical of the claims or defenses of the class, and the representative

7  parties will fairly and adequately protect the interests of the class.

8      70.    Plaintiff brings this nationwide class action pursuant to Rule 23 of

9  the Federal Rules of Civil Procedure on behalf of itself and all members of the

10  following subclasses:

11           THE WTT SUBCLASS: All GIGA WATT investors
            who, between June 1, 2017 and August 7, 2017,
12          transferred bitcoins, Ether, alternative cryptocurrencies,
            or any other form of monies or currency to Defendants in
13          furtherance of GIGA WATT's ICO and who were both
            not issued their WTT within the timeframe set forth in
14          the GIGA WATT White Paper and not provided a refund
            of their investment at the rate prevailing at the time of the
15          refund. Excluded from the class are: Defendants
            themselves, Defendants' retail employees, Defendants'
16          corporate officers, members of Defendants' boards of
            directors, Defendants' senior executives, and any and all
17          judicial officers (and their staff) assigned to hear or
            adjudicate any aspect of this litigation.
18
             The WTT Sub-Class asserts claims for Unregistered
19          Offer and Sale of Securities in Violation of Sections 5(a)
            and 5(c) of the Securities Act and Rescission (*see*,
20          Counts I and II).

CLASS ACTION COMPLAINT - 24

1

2

3

4

5

6

7

8

9

10

11

     THE MINING MACHINERY SUBCLASS: All GIGA WATT investors who, between June 1, 2017 and August 7, 2017, transferred bitcoins, Ether, alternative cryptocurrencies, or any other form of monies or currency to Defendants for the purchase of mining machinery and related equipment in connection with GIGA WATT's ICO and who both did not have their mining machinery and related equipment deployed within the timeframe set forth in the GIGA WATT White Paper and not provided a refund of their investment at the rate prevailing at the time of the refund. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.

     The Mining Machinery Sub-Class asserts a claim for Rescission of Contract (*see*, Count II).

12

13

     71.    This action satisfies all of the requirements of Rule 23, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

14

## Numerosity

15

16

     72.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

17

18

19

     73.    While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

20

1    74.    Again, while the exact number is not known at this time, it is easily

2    and generally ascertainable by appropriate discovery.

3    75.    It is impractical for each class member to bring suit individually.

4    76.    Plaintiff does not anticipate any difficulties in managing this action as

5    a class action.

6    **Commonality and Predominance**

7    77.    There are many common questions of law and fact involving and

8    affecting the parties to be represented.

9    78.    When determining whether common questions predominate, courts

10    focus on the issue of liability; and if the issue of liability is common to the class

11    and can be determined on a class-wide basis, as in the instant matter, common

12    questions will be held to predominate over individual questions.

13    79.    Common questions include, but are not limited to, the following:

14    (a)    Whether the Giga Watt tokens offered for sale in
         advance of the GIGA WATT ICO constitute securities
15         under federal securities laws;

16    (b)    Whether Defendants violated federal securities laws in
         conducting the Initial Coin Offering and in failing to
17         register the Giga Watt tokens as securities;

18    (c)    Whether statements made by Defendants before the
         scheduled GIGA WATT ICO misrepresented material
19         facts about the Giga Watt Project and the value of Giga
         Watt tokens;

20

(d)    Whether Defendants have converted the funds belonging to Plaintiff and the Class Members;

(e)    Whether Defendants owed duties to Plaintiff and the Class Members, what the scope of those duties were, and whether Defendants breached those duties;

(f)    Whether Defendants' conduct was unfair or unlawful;

(g)    Whether the terms of GIGA WATT's ICO are unconscionable, void, or voidable;

(h)    Whether Defendants has been unjustly enriched; and

(i)    Whether Plaintiff and the Class Members have sustained damages as a result of Defendants' conduct.

80.    These common questions of law or fact predominate over any questions affecting only individual members of the Class.

**Typicality**

81.    Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

82.    Plaintiff is advancing the same claims and legal theories on behalf of itself and all members of the Class.

**Adequacy of Representation**

83.    Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that

1    would be antagonistic to those of the other members of the Class.

2        84.    Plaintiff is committed to the vigorous prosecution of this action and

3    has retained competent counsel, experienced in complex consumer class action

4    litigation of this nature, to represent them.

5        85.    Plaintiff seeks no relief that is antagonistic or adverse to the

6    members of the Class.

7        86.    The infringement of the rights and the damages Plaintiff has suffered

8    are typical of other Class members.

9        87.    To prosecute this case, Plaintiff has chosen the law firms of Terrell

10    Marshall Law Group PLLC ("TMLG") and Silver Miller.  TMLG and Silver

11    Miller are experienced in class action litigation and have the financial and legal

12    resources to meet the substantial costs associated with this type of litigation.

13                              **Superiority**

14        88.    Class action litigation is an appropriate method for fair and efficient

15    adjudication of the claims involved herein.

16        89.    Class action treatment is superior to all other available methods for

17    the fair and efficient adjudication of the controversy alleged herein; as it will

18    permit a large number of Class Members to prosecute their common claims in a

19    single forum simultaneously, efficiently, and without the unnecessary duplication

20    of evidence, effort, and expense that hundreds of individual actions would

CLASS ACTION COMPLAINT - 28

1  require.

2  90. Class action treatment will permit the adjudication of relatively

3  modest claims by certain Class Members, who could not individually afford to

4  litigate a complex claim against well-funded corporate defendants like

5  Defendants.

6  91. Further, even for those Class Members who could afford to litigate

7  such a claim, it would still be economically impractical.

8  92. The nature of this action and the nature of laws available to Plaintiff

9  make the use of the class action device a particularly efficient and appropriate

10  procedure to afford relief to Plaintiff and the Class Members for the wrongs

11  alleged because:

12      (a) Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and

13          overwhelm the limited resources of each individual Class member with superior financial and legal

14          resources;

15      (b) The costs of individual suits could unreasonably consume the amounts that would be recovered;

16

17      (c) Proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the

18          Class to recover on the cause of action alleged;

19      (d) Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this

20          litigation;

1

2

3

4

5

6

       (e)     The Class Members are geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit;

       (f)     There are no known Class Members who are interested in individually controlling the prosecution of separate actions; and

       (g)     The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum.

7

8

9

10

93.    Plaintiff reserves the right to modify or amend the definition of the proposed class/subclasses and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

11

12

94.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

13

14

95.    Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

15

16

96.    As a result of the foregoing, Plaintiff and the Class Members have been damaged in an amount that will be proven at trial.

17

18

19

97.    Plaintiff has duly performed all of its duties and obligations, and any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or else have been excused or waived.

20

CLASS ACTION COMPLAINT - 30

1   98.   To enforce its rights, Plaintiff has retained undersigned counsel and

2   is obligated to pay counsel a reasonable fee for its services, for which Defendants

3   are liable as a result of their bad faith and otherwise.

**COUNT I**
**Unregistered Offer and Sale of Securities**
**In Violation of Sections 5(a) and 5(c) of The Securities Act**

6   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 98 above,

7   and further alleges:

8   99.   Defendants, by engaging in the conduct described above, directly or

9   indirectly made use of means or instruments of transportation or communication

10   in interstate commerce or of the mails to offer to sell or to actually sell securities,

11   or to carry or cause such securities to be carried through the mails or in interstate

12   commerce for the purpose of sale or for delivery after sale.

13   100.   Defendants are "sellers" within the meaning of 15 U.S.C. § 77e

14   because they or their agents solicited Plaintiff's and the Class Members'

15   investments in the GIGA WATT ICO.

16   101.   The terms of the GIGA WATT ICO called for an investment of

17   cryptocurrency or fiat currency by Plaintiff and the Class Members.

18   102.   The funds paid by Plaintiff and the Class Members pursuant to the

19   GIGA WATT ICO were pooled by Defendants in an effort by Defendants to

20   secure a profit for themselves and the investors. As a result, the investors,

CLASS ACTION COMPLAINT - 31

1   including Plaintiff and the Class Members, shared in the risks and benefits of the

2   investment.

3       103.   Plaintiff and the Class Members relied on, and are dependent upon,

4   the expertise and efforts of Defendants for their investment returns.

5       104.   Plaintiff and the Class Members expected that they would receive

6   profits from their investments in Defendants' efforts.

7       105.   Giga Watt tokens constitute investment contracts and are therefore

8   subject to federal securities laws, including the registration requirements

9   promulgated thereunder.

10       106.   No registration statements have been filed with the SEC or have

11   been in effect with respect to any of the offerings alleged herein.

12       107.   By reason of the foregoing, Defendants have violated Sections 5(a)

13   and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

14       108.   As a direct and proximate result of Defendants' unregistered sale of

15   securities, Plaintiff and the Class Members have suffered damages in connection

16   with their respective purchases of Giga Watt tokens securities in the GIGA

17   WATT ICO.

18

19

20

1

2

**COUNT II**
**Rescission of Contract**

3        Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 108

4  above, and further alleges:

5        109.    The terms of the GIGA WATT ICO constitute a contract between:

6  (1) Plaintiff and the Class Members, and (2) Defendants.

7        110.    The contract was entered into by and between Defendants and each

8  Class Member between July 1, 2017 and August 7, 2017.

9        111.    The terms of the GIGA WATT ICO called for an investment of

10  cryptocurrency by Plaintiff and the Class Members.

11        112.    The funds paid by Plaintiff and the Class Members pursuant to the

12  GIGA WATT ICO were pooled by Defendants in an effort by Defendants to

13  secure a profit for themselves and the investors. As a result, the investors,

14  including Plaintiff and the Class, shared in the risks and benefits of the

15  investment.

16        113.    Plaintiff and the Class Members relied on, and are dependent upon,

17  the expertise and efforts of Defendants for their investment returns.

18        114.    The terms of the GIGA WATT ICO constitute an investment

19  contract and is therefore subject to federal and state securities laws, including the

20  registration requirements promulgated thereunder.

1    115.   No registration statement was filed or in effect with any federal or

2    state regulatory body, and no exemption from registration exists with respect to

3    the GIGA WATT ICO.

4    116.   Moreover, contrary to the terms of the GIGA WATT White Paper --

5    which stated that all invested cryptocurrency would be held in escrow and would

6    only "be released from escrow in step with the completion of facilities" --

7    Defendants have represented to Plaintiff that, without regard to GIGA WATT's

8    failure to have completed its facilities, virtually all of the cryptocurrency raised

9    from investors in the ICO has been liquidated into U.S. Dollars and has been

10   transferred from the escrow account to an operating account, which Plaintiff and

11   other Class Members reasonably believe the funds raised have been dissipated, or

12   will be dissipated, before the investors receive their Giga Watt tokens/mining

13   equipment or any opportunity to receive a return on their investments.

14   117.   As a result of Defendants' false representations and violation of

15   federal securities laws in connection with the GIGA WATT ICO, Plaintiff and the

16   Class Members state their demand that the Contract be rescinded and canceled.

17   118.   To the extent that Plaintiff has received from Defendants any

18   benefits through the contract -- though none are known to them at this time --

19   Plaintiff hereby offers to restore to Defendants those benefits, once they are

20   identified and can be quantified.

1    119.   As a direct and proximate cause of Defendants' conduct, Plaintiff

2   and the Class Members have been damaged.

3    120.   Defendant GIGA WATT, INC. is subject to liability because it

4   solicited and otherwise participated in the sale to Plaintiff and the Class Members

5   of the unregistered securities identified herein. Moreover, Defendant GIGA

6   WATT, INC. is subject to liability because it is believed to control, or have

7   obtained control over, a large portion of the assets invested by Plaintiff and the

8   Class Members which must be disgorged and returned to Plaintiff and the Class

9   Members in effectuating the rescission of the contract into which they were

10  unlawfully led.

11    121.   Defendant GIGA WATT, PTE, LTD. is subject to liability because it

12  solicited and otherwise participated in the sale to Plaintiff and the Class Members

13  of the unregistered securities identified herein. Moreover, Defendant GIGA

14  WATT, PTE, LTD. is subject to liability because it is believed to control, or have

15  obtained control over, a large portion of the assets invested by Plaintiff and the

16  Class Members which must be disgorged and returned to Plaintiff and the Class

17  Members in effectuating the rescission of the contract into which they were

18  unlawfully led.

19

20

CLASS ACTION COMPLAINT - 35

1

## PRAYER FOR RELIEF

2      WHEREFORE, Plaintiff STORMSMEDIA, LLC, individually and on

3  behalf of all others similarly situated, respectfully prays for relief as follows:

4      A.      A declaration from this Court that this action is a proper class action,

5  including certification of the proposed Class, appointment of Plaintiff as the class

6  representatives, and appointment of Plaintiff's counsel as class counsel;

7      B.      An Order enjoining Defendants from making further transfers or

8  dissipations of the investment funds and assets raised in connection with the

9  promoted GIGA WATT ICO, or using such funds and assets in any further

10  purchases or transactions;

11      C.      A judgment awarding Plaintiff and the Class Members equitable

12  restitution, including, without limitation, rescission of their investments in GIGA

13  WATT, restoration of the *status quo ante*, and return to Plaintiff and the Class

14  Members all cryptocurrency or fiat currency paid to Defendants in connection

15  with the purported ICO as a result of Defendants' unlawful and unfair business

16  practices and conduct;

17      D.      An award of any and all additional damages recoverable under law --

18  jointly and severally entered against Defendants -- including but not limited to

19  compensatory damages, punitive damages, incidental damages, and consequential

20  damages;

E.      An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with the GIGA WATT ICO;

F.      An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

G.      Pre- and post-judgment interest;

H.      Attorneys' fees, expenses, and the costs of this action; and

I.      All other and further relief as this Court deems necessary, just, and proper.

## <u>PLAINTIFF'S DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 27th day of December, 2017.

TERRELL MARSHALL LAW GROUP PLLC

By:   /s/ Beth E. Terrell, WSBA #26759
      Beth E. Terrell, WSBA #26759
      Blythe H. Chandler, WSBA #43387
      Attorneys for Plaintiff and the Class
      936 North 34th Street, Suite 300
      Seattle, Washington 98103
      Telephone: (206) 816-6603
      Facsimile: (206) 319-5450
      Email:  bterrell@terrellmarshall.com
      Email:  bchandler@terrellmarshall.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

David C. Silver, *pro hac vice forthcoming*
Jason S. Miller, *pro hac vice forthcoming*
Attorneys for Plaintiff and the Class
SILVER MILLER
11780 West Sample Road
Coral Springs, Florida 33065
Telephone: (954) 516-6000
Email: DSilver@SilverMillerLaw.com
Email: JMiller@SilverMillerLaw.com